UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

UNITED STATES OF AMERICA,

-v-

LORENZO ANDERSON,

Defendant.

---------------------------------------------------------------------X

26-CR-141 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

On December 14, 2025, Defendant Lorenzo Anderson was walking his dog off leash in a public park when he was stopped by officers with the New York City Police Department ("NYPD"), who recognized him to be the subject of an active "investigation card" or "I-Card," a form used by the NYPD to internally flag suspects and witnesses. After Anderson refused to produce identification, the officers arrested him; a search incident to that arrest yielded a firearm and drugs. Thereafter, a grand jury indicted Anderson for possession of a firearm after a felony conviction, possession with intent to distribute a controlled substance, and knowingly using and carrying a firearm in connection with a drug trafficking crime. *See* ECF Nos. 6-7.

Anderson now moves to suppress the evidence seized incident to his arrest (as well as statements he made), arguing that the NYPD officers lacked probable cause to arrest him. *See* ECF No. 20 ("Def.'s Mem."), at 1-2. For the reasons that follow, the Court disagrees. First, the I-Card was supported by probable cause, and it was reasonable for the arresting officers to rely on the knowledge it conveyed. Second, and in any event, the officers had probable cause to arrest Anderson for walking his dog without a leash. Accordingly, and for the reasons that follow, Anderson's motion to suppress must be and is denied.

## BACKGROUND

The following relevant facts are largely undisputed, in no small part because the record includes footage from the body cameras of both the NYPD officers involved in Anderson's arrest and the NYPD officers involved in the investigation that preceded the arrest.

On September 20, 2025, two NYPD officers responded to a 911 call regarding a domestic disturbance. *See* ECF No. 21 ("Gov't's Mem."), at 2; *see also* September Body Camera Footage at 00:01:25-00:09:11.[1] When the officers arrived at the caller's residence, a woman answered the door and asked the officers for assistance removing her "boyfriend" from her home; her boyfriend, she noted, was "destroying things" and had "hit [her] in [her] face" earlier that day. *Id.* at 00:04:30-00:05:50. Visibly distressed, the woman asked the responding officers how to apply for an order of protection against her boyfriend. *Id.* But during the encounter, the woman generally declined to cooperate and shut her door repeatedly to speak privately with another woman at her residence. *Id.* at 00:09:18-00:09:25; 00:13:02-00:15:10; 00:15:54-00:16:52; 00:17:38-00:18:53. Eventually, she informed the officers that her boyfriend was "Lorenzo Anderson," the Defendant here, but she refused the officers' requests for Anderson's photograph and contact information and to travel with them to the precinct. *Id.* at 00:22:27-00:23:00.

Later that day, one of the responding officers wrote a complaint report identifying Anderson as a suspect for assault in the third degree, a Class A misdemeanor. *See* ECF No. 21-2 ("Gov't's Ex. 2"); *see* N.Y. Penal Law § 120.00. Five days later, on September 25, 2025, a detective who was assigned the assault investigation, generated an I-Card — "an internal NYPD form issued by an officer when there is a suspect, witness, or perpetrator to be investigated,"

---

[1] The September Body Camera Footage was filed as Exhibit 1 to the Government's Memorandum of Law in Opposition to Anderson's motion to suppress. *See* ECF No. 21-1. The time stamps refer to the times embedded in the video.

*United States v. Esters*, No. 21-CR-398 (EK), 2022 WL 16715891, at *2 n.4 (E.D.N.Y. Nov. 4, 2022) — identifying Anderson as the perpetrator of an assault. Significantly, the I-Card noted that "probable cause" existed for Anderson's arrest. *See id.*; *see also United States v. Fleming*, No. 18-CR-197 (KAM), 2019 WL 486073, at *2 (E.D.N.Y. Feb. 6, 2019) (observing that I-Cards either denote "probable cause," indicating probable cause to arrest a perpetrator, or "suspect only," showing "the subject . . . is a person of interest"). Shortly thereafter, however, the detective conducted a telephone interview with the woman who had reported that Anderson hit her. *See* ECF No. 20-1, at 11.[2] In a report, the detective noted that the woman "sounded highly uncooperative" and "stopped speaking over the phone." *Id.* Six days later, the detective closed the case but, in his closing report, explicitly noted that Anderson's I-Card remained "ACTIVE." *See* ECF No. 20-1, at 13.

Weeks passed, and Anderson's I-Card remained active. On December 14, 2025, at approximately 4:30 p.m., two uniformed NYPD officers were patrolling in a marked police car when they witnessed Anderson — whom they identified as having the active I-Card — enter Hunts Point Playground in the Bronx. *See* ECF No. 1 ("Compl."), at 2. Anderson was walking his dog inside the park without a leash. *See* December Body Camera Footage at 00:01:25-00:01:32.[3] The officers approached, asked Anderson for identification, and instructed him that he was not allowed walk his dog off leash. *Id.* at 00:01:25-00:02:08. Anderson initially responded that he did not have his identification, then quibbled with the officers over whether he was required to identify himself and whether walking his dog off leash was in fact an offense.

---

[2] For ease of reference, the page references for ECF No. 20-1 are to the pagination automatically generated by the Electronic Case Filing system.

[3] The December Body Camera Footage was filed as part of Exhibit 1 to Anderson's motion. *See* ECF No. 20-1, at 17. The time stamps refer to the times embedded in the video.

*Id.* at 00:01:53-00:03:59. Eventually, the officers placed Anderson under arrest. *Id.* at 00:04:00-00:04:30. When they searched Anderson, the officers recovered drugs in his pocket and a firearm in his waistband. *See* Compl. 2-4. Another search at the police station turned up more drugs as well as cash. *Id.* at 4. This physical evidence now forms the basis for the firearm and drug charges brought against Anderson. *See* ECF No. 7.

**LEGAL STANDARDS**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As its language indicates, the Amendment's "ultimate touchstone . . . is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014). It is well established that a warrantless search is "*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One relevant exception is the search-incident-to-arrest doctrine, which permits police officers to perform a search of a person in connection with a lawful arrest. *Riley*, 573 U.S. at 381-84. As the Supreme Court has explained, the search-incident-to-arrest doctrine serves the twin purposes of "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). Those interests are assumed to be present whenever an officer effects an arrest and, thus, need not be demonstrated on a case-by-cases basis. *Riley*, 573 U.S. at 384.

For purposes of the Fourth Amendment, a lawful arrest requires probable cause. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 177 (2008). Probable cause "exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is

being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). Probable cause "is a fluid concept," *Florida v. Harris*, 568 U.S. 237, 244 (2013) (internal quotation marks omitted), which is not "readily, or even usefully, reduced to a neat set of legal rules," *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (internal quotation marks omitted). Significantly, however, it is well established that "[p]robable cause is to be assessed on an objective basis." *Zellner*, 494 F.3d at 369. Thus, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see Whren v. United States*, 517 U.S. 806, 812-13 (1996) (reviewing cases). Further, "an officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Zellner*, 494 F.3d at 369 (quoting *Devenpeck*, 543 U.S. at 153). Put simply, an arrest — and, by extension, a search incident to arrest — "is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime." *Id.*

The concept of probable cause has also evolved to match the demands of modern policing. Because an "arresting officer cannot always be aware of every aspect of an investigation," the facts underlying a probable cause determination can be imputed from one law enforcement officer to another. *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (internal quotation marks omitted). Under what is sometimes referred to as the "collective" or "imputed knowledge doctrine," an arresting officer need not possess the "specific information to form the basis for probable cause" so long as "sufficient information to justify the arrest . . . was known by other law enforcement officials initiating or involved with the investigation." *Id.* But as with many doctrines, there are limits. Courts have declined to extend the doctrine to, for

example, cases where officers relied on the probable cause or reasonable suspicion assessments of responders without law enforcement training, *see id.* at 135-36 (911 dispatcher); *United States v. Santa*, 180 F.3d 20, 26-30 (2d Cir. 1999) (court clerk), where it was unclear that the event to which knowledge was imputed preceded the arrest, *see Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003), and where there was no evidence that the officers had communicated with each other, *United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016).

## DISCUSSION

Anderson argues that the police lacked probable cause to arrest him for misdemeanor assault and, even if they had probable cause, that the Fourth Amendment did not permit his arrest because the offense was committed outside the presence of the arresting officers. *See* Def.'s Mem. 9-17. The Government opposes these arguments and contends, in the alternative, that Anderson's arrest was independently supported by probable cause for walking his dog off leash in a public park. *See* Gov't's Mem. 7-19. The Government has the better of the arguments.

### A. Probable Cause Based on the September 20, 2025 Incident

Anderson's challenges to probable cause based on the September 20, 2025 incident are threefold. First, he argues that the facts underlying the incident cannot be imputed to the officers who arrested him on December 14, 2025, because an I-Card is not a warrant and has no constitutional significance. *See* Def.'s Mem. 10-12. Second, he contends that any probable cause dissipated when, on October 1, 2025, the detective closed the case. *See id.* at 12-13. And third, he contends that the Fourth Amendment does not permit an officer to arrest someone for a misdemeanor offense that was committed outside of the officer's presence. *See id.* at 13-17. The Court will address each of these arguments in turn.

There is limited case law exploring the effect of I-Cards on the collective knowledge doctrine and probable cause under the Fourth Amendment. But the handful of district courts in this Circuit that have considered the issue have generally held that arresting officers are entitled to rely on the probable cause determinations of the officers who generated I-Cards. *See, e.g., Esters*, 2022 WL 16715891, at *6; *Watkins v. Ruscitto*, No. 14-CV-7504 (AJP), 2016 WL 3748498, at *7 (S.D.N.Y. July 11, 2016); *Fleming*, 2019 WL 486073, at *7; *Dowtin v. O'Neill*, No. 16-CV-6119 (LDH) (LB), 2019 WL 7496574, at *2 (E.D.N.Y. Jan. 7, 2019). Still, that reliance has limits. In one case where the district court declined to apply the doctrine, the court's decision rested on the "Government's failure to provide any evidence as to whether the detective had probable cause to issue the I-Card" in the first instance. *United States v. Dudley*, 18-CR-670 (SJ) (RER) (E.D.N.Y. 2020), ECF No. 49 ("*Dudley* Report and Recommendation"), at 9, *report and recommendation adopted* (Dec. 3, 2020). "The validity of an arrest pursuant to an I-Card," the court held, "derives wholly from the information provided to the law enforcement official who issues the I-Card." *Id.* The New York Court of Appeals also recently weighed in, concluding that although police officers can rely on the collective knowledge transmitted through an I-Card, "[a]s with any communication, the [Government] must adduce evidence that the arresting officer received the information communicated by the I-card and relied on it in arresting the defendant." *People v. Palacios*, No. 28, 2026 WL 1026306, at *3 (N.Y. Apr. 16, 2026) (citing New York cases).

It is true that "an I-Card is not a warrant and should not be treated as such by the Government when no independent judicial assessment has been made as to the existence of probable cause." *Dudley* Report and Recommendation 9. But it does not follow that an arrest based on knowledge transferred through any I-Card is constitutionally deficient. Instead, the

relevant question is whether the "arresting officers acted in objectively reasonable reliance on some assessment" of probable case when consulting the I-Card. *Colon*, 250 F.3d at 137. In this case, the Court concludes that they did.

First, while the detective who issued the I-Card did not respond to the 911 call on September 20, 2025, himself, the record suggests that he "acted on the assessment or instructions of" the responding officers. *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017); *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("Police officers, when making a probable cause determination, are entitled . . . to rely on the allegations of fellow police officers."). After he was assigned the case, the detective had access to the responding officers' complaint report, *see* Gov't's Ex. 2, as well as their body camera footage — both of which contained information about the victim's identification of Anderson as the "boyfriend" who had "hit" her on her "face," *see* September Body Camera Footage at 00:04:30-00:05:50; 00:22:27-00:23:00. "[A]bsent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause." *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) (internal quotation marks omitted). Thus, based on the information available to the detective, a "trained and experienced law enforcement officer," *see Fleming*, 2019 WL 486073, at *8, it was objectively reasonable for him to issue an I-Card indicating that there was "probable cause to arrest" Anderson as the "perpetrator" of an "assault," *see* Def.'s Ex. A (cleaned up).

Second, the arresting officers "properly relied on" the I-Card in arresting Anderson. *Fleming*, 2019 WL 486073, at *4, 7-9. There is no dispute that the arresting officers had actual knowledge of the I-Card before the arrest. *Cf. Palacios*, 2026 WL 1026306, at *3 (concluding the Government could not rely on the collective knowledge doctrine because "the [Government]

presented no direct evidence that prior to arresting the defendant, the arresting officers were aware of the I-[C]ard and relied upon it in effectuating the defendant's arrest"). Instead, Anderson's challenge hinges on the detective's choice to close the case. The case's closure, he argues, reveals "the discovery of [an] intervening fact" that "vitiate[s] probable cause." *Esters*, 2022 WL 16715891, at *5 (internal quotation marks omitted); *see* Def.'s Mem. 12-13. According to the Government, however, the case closure did not result from the discovery of "exculpatory evidence," *see Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), but rather from the unwillingness of the victim to cooperate, *see* ECF No. 20-3 ("Def.'s Ex. D"); Gov't's Mem. 9-10.

The victim's unwillingness to cooperate may have affected the likelihood of conviction (and thus caused the detective to close the case), but the Court is not convinced that it constituted an "intervening fact" exposing "the groundless nature of the charges." *Esters*, 2022 WL 16715891, at *5. Indeed, "[n]ot every indication that a witness is wavering . . . will vitiate probable cause." *Id.* That is especially true in the domestic violence context, where victims' refusal to cooperate is commonplace. *See Felix v. New York State Dep't of Corr. & Cmty. Supervision*, No. 16-CV-7978 (CS), 2018 WL 3542859, at *9 (S.D.N.Y. July 23, 2018) ("[E]ven if she had recanted . . . , it would have been entirely reasonable for [the officer] to credit her contemporaneous statements rather than her after-the-fact version."). Here, neither the administrative case closure nor the phone call suggests new facts undermined the probable cause determination. Accordingly, the Court concludes there is no evidence that probable cause for the misdemeanor assault dissipated in the weeks preceding Anderson's arrest.

Anderson's final argument with respect to the September 20, 2025 incident concerns the English common law rule, adopted by some states, that warrantless arrests for misdemeanors are

impermissible unless the offense took place in the presence of the arresting officer. *See, e.g.*, *Bad Elk v. United States*, 177 U.S. 529, 534-35 (1900) (citing to English authorities). He argues that the Fourth Amendment incorporates this requirement and that his arrest based on misdemeanor assault was therefore unconstitutional. *See* Def.'s Mem. 13-17. The Supreme Court has expressly left open the question of whether the Fourth Amendment incorporates this common law requirement. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 340 n.11 (2001). As the Government notes, however, most Circuits have answered the question in the negative. *See* Gov't's Mem. 12-13 (citing cases); *see also United States v. Gonzalez*, 107 F.4th 1304, 1310 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 529 (2025). The Second Circuit itself has yet to weigh in on the question. *See Esters*, 2022 WL 16715891, at *7.

The Court need not weigh in on the question here. That is because, regardless of whether or not the Fourth Amendment incorporates the common law in-the-presence requirement, New York State law does not, *see* N.Y. Crim. Pro. L. § 140.10 ("[A] police officer may arrest a person for . . . a crime when he or she has reasonable cause to believe that such person has committed such crime, whether in his or her presence or otherwise."); *see also* N.Y. Penal L. § 10.00(6) (defining "crime" as a "misdemeanor or a felony"), and an officers' good-faith reliance on the constitutionality of a state statute is objectively reasonable, *see Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) ("Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law."). Given the case law cited above, Anderson could not — and conspicuously does not — contend that New York's statute authorizing misdemeanor arrests outside of an officer's presence is "clearly unconstitutional." *Id.* at 349-50. It follows that it was objectively reasonable for the arresting officers to rely on New York State law permitting misdemeanor arrests for offenses outside of their presence.

For the foregoing reasons, the Court concludes that the September 20, 2025 incident provided the arresting officers with probable cause to lawfully arrest Anderson.

**B. Probable Cause Based on Off-Leash Dogwalking**

The Court's analysis could end there. But the Government also offers a standalone justification supporting probable cause for Anderson's arrest: the fact that he was walking his dog off leash in Hunts Point Playground. Gov't's Mem. 17-19. Neither party disputes that, at the time of Anderson's arrest, the arresting officers personally witnessed Anderson walking his dog off leash inside of Hunts Point Playground, a public park under the control of the New York City Department of Parks and Recreation. *See* Def.'s Mem. 5-7; Gov't's Mem. 17-20; ECF No. 25 ("Def.'s Reply") at 16-17. Instead, the parties disagree about whether that conduct was an arrestable offense. *See* Gov't's Mem. 17-20; Def.'s Mem. 16-17. Anderson argues that after the Bail Elimination Act of 2019, N.Y. Crim. Pro. § 150.20 (effective Jan. 1, 2020), officers can no longer make arrests for petty offenses, Def.'s Reply 16-17; *see Johnson v. City of New York*, No. 25-CV-92 (PKC), 2026 WL 1453603, at *1-2 (S.D.N.Y. May 22, 2026) (explaining the Act's effects). He also suggests that New York City law disallows off-leash dogs only inside unenclosed parks. *See* Def.'s Reply 17 (citing N.Y.C. Health Code § 161.05).

To start, the Court agrees with the Government that Anderson's conduct at the time of his arrest violated New York City's leash law. The New York City Health Code provides, in relevant part, that "[d]ogs within areas and facilities under the jurisdiction and control of the Department of Parks and Recreation ('DOPR'), or successor agency, shall be restrained except as otherwise permitted in accordance with the rules of the DOPR." N.Y.C. Health Code § 161.05(b)(1). The rules of the DOPR do not, in turn, provide any allowance for unrestrained dogs in unenclosed parks. And even if they did, the rules further specify that, "*in no event* shall

dogs or other animals be allowed to enter any playground." 56 R.C.N.Y. § 1-04(i)(2) (emphasis added). Anderson does not dispute that the relevant conduct took place in Hunts Point Playground. *See* Def.'s Mem. 5; Gov't's Mem. 4. It follows that the arresting officers had probable cause to believe that Anderson had violated the leash laws.

Whether the officers had authority to arrest Anderson for the violation of the leash laws is a closer question. The answer turns on whether the Bail Elimination Act of 2019 stripped officers of the ability to arrest for offenses that are now ticketable. For certain offenses, including violations, Section 150.20 now provides that, "[w]henever a police officer is authorized pursuant to [N.Y. Crim. Pro. L. §] 140.10 of this title to arrest a person without a warrant for an offense . . . he shall . . . instead issue and serve upon such person an appearance ticket." N.Y. Crim. Pro. L. § 150.20(1)(a). The 2019 Bail Elimination Act made the issuance of tickets mandatory rather than discretionary by substituting the word "may" with "shall." *See* Bail Elimination Act of 2019, S. 2101, 2019-2020 Reg. Sess. § 2 (N.Y. 2019). Anderson argues that the plain text of the law, as amended in 2019, thus forbids arrests for violation of the leash laws. Def.'s Reply 16. The Government responds that the 2019 amendments only require that, after arrest, the police issue a ticket in lieu of continued detention. *See* Gov't's Mem. 19.

Only a few courts have grappled with the Act's effects on arrests for otherwise ticketable violations. Significantly, however, no New York court has adopted the interpretation of the 2019 Act that Anderson advances. Those that have addressed the issue have assumed or held that the amendment affects only post-arrest procedures. *See, e.g., Douglas v. City of New York*, 249 N.Y.S.3d 768, 784 (N.Y. Sup. Ct. 2026) ("[N.Y. Crim. Pro. L.] § 150.20 only applies where a police officer is *already authorized* to arrest the subject individual pursuant to [N.Y. Crim. Pro. L.] § 140.10"); *McQueen v. City of New York*, 226 N.Y.S.3d 839, 843 (N.Y. Sup. Ct. 2025)

(referring to "§ 150.20(1)(a)'s directive requiring the issuance of an appearance ticket for an *arrest* without a warrant" (emphasis added)); *but cf. Douglas v. City of New York*, 190 N.Y.S.3d 847, 857 (N.Y. Supp. Ct. 2023) (denying defendants' motion to dismiss a claim of constitutional violation without deciding whether "§ 150.20(1)(a) required police officers to issue appearance tickets in lieu of arresting them" because plaintiffs were detained "for longer than necessary in poor conditions to determine their eligibility for the appearance tickets"). Federal courts in the Second Circuit have likewise presumed that the amendment of Section 150.20 had no effect on the authority of officers to conduct an arrest. *See, e.g., Zarkower v. City of New York*, 461 F. Supp. 3d 31, 38 (E.D.N.Y. 2020) ("The [desk appearance ticket] procedure operates as an alternative to holding an arrestee in custody until arraignment."); *United States v. Boone*, No. 23-CR-328 (JPO), 2025 WL 1928028, at *1 (S.D.N.Y. July 14, 2025) ("Violations of the leash law are punishable by a fine and imprisonment for up to ten days for a first-time offense.").

Consistent with this case law, the Court concludes that the amendments to the bail statute, *see* N.Y. Crim. Pro. L. § 150.20, did not strip officers of the authority to arrest Anderson for his violation of New York City law, *see id.* § 140.10; N.Y.C. Health Code § 161.05(b)(1). For one thing, New York's 2019 amendments were focused on *bail*; they did nothing to address, much less repeal, state law on the authority to arrest. *Douglas*, 249 N.Y.S.3d at 784 (noting a defendant's reading of the statute as barring arrest was "unsupported by the text, structure, or purpose of" Section 150.20). Moreover, even if the amendments *did* narrow the authority to arrest, Anderson's case falls squarely within the statute's exception. Under Section 150.2(1)(b)(iii), officers are "not required to issue an appearance ticket if . . . the person has been given a reasonable opportunity to make their verifiable identity . . . known, and has been . . . unwilling to do so." N.Y. Crim. Pro. L. § 150.20. The undisputed evidence confirms

that Anderson repeatedly refused the arresting officers' requests for him to identify himself. *See* December Body Camera Footage at 00:01:25-00:01:35. Thus, even accepting Anderson's reading of Section 150.20(1)(a), the officers retained authority to arrest him under this exception.

In short, the Court concludes that Anderson's arrest was lawful based on his violation of New York City's leash laws as well.

**CONCLUSION**

For the foregoing reasons, the Court holds that Anderson's arrest was supported by probable cause. Accordingly, his motion to suppress must be and is DENIED.

The Clerk of Court is directed to terminate ECF No. 19.

SO ORDERED.

Dated: October 14, 2026
New York, New York

JESSE M. FURMAN
United States District Judge